IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge John L. Kane

Civil Action No. **08-cv-0256**

**NATHAN DUNLAP**,

      Petitioner,

v.

**ARI ZAVARAS, Executive Director, Colorado Department of Corrections,**

      Respondent.

---

## MEMORANDUM OPINION AND ORDER
## (CHUCK E. CHEESE)

---

**Kane, J.**

      Petitioner Nathan Dunlap was convicted and sentenced to death for committing four murders in 1993 in Colorado. He petitions for habeas corpus relief. I have thoroughly considered the briefs, transcripts and record in this matter, and find oral argument unnecessary.[1] For the reasons stated below, Dunlap's Amended Petition for Habeas Corpus Relief (Doc. 54) is DENIED.

## BACKGROUND

### The Crime

      Nathan Dunlap entered a Chuck E. Cheese restaurant in Aurora, Colorado shortly before 9:00 p.m. on December 14, 1993. He had recently been fired from the restaurant and vowed to

---

[1] The facts in this opinion are drawn from Dunlap's initial appeal of his sentence to the Colorado Supreme Court, *People v. Dunlap*, 975 P.2d 723 (Colo. 1999) ("*Dunlap I*"), the briefs and the transcripts of post-conviction proceedings.

kill the manager.  Once inside, Dunlap sat at a table alone, ordered a sandwich, called his girlfriend, played a video game and spoke with an employee.  Around 9:50 p.m., Dunlap went to the men's bathroom where he waited for the restaurant to close.  He had a concealed small caliber handgun with him.

Dunlap remained in the bathroom until the final customers left.  At approximately 10:10 p.m. he burst onto the restaurant floor.  Nineteen-year-old Sylvia Crowell was closing down the salad bar near the restroom.  Dunlap shot her in the head at close range.  He next turned to seventeen-year-old Ben Grant, who was vacuuming, and shot him in the face near his left eye.  Seventeen-year-old Colleen O'Conner, who had witnessed the first two attacks, knelt before Dunlap, begging for her life.  Disregarding her plea for mercy, Dunlap shot her through the top of the head.  Dunlap then went to the kitchen, where nineteen-year-old Bobby Stephens was cleaning up.  Dunlap shot Stephens in the face, knocking him to the ground.  Manager Marge Kohlberg, a fifty-year-old mother of two, was in the back office totaling the day's receipts.  Dunlap demanded she open the store's safe.  After she complied, Dunlap shot her through the left ear.  Noticing she was still alive, Dunlap shot her through the right ear, killing her instantly.  He emptied Kohlberg's purse over her body, filled it with about $1,500 from the safe, Chuck E. Cheese key chains and arcade game tokens, and left.

While Dunlap was in the back office, Stephens recovered enough from the shot to his face to run out an emergency exit, setting off an alarm. He ran to a nearby apartment complex and called for help.  Stephens was the only survivor of Dunlap's attacks.  The other four victims died within hours.

Dunlap was questioned by police the night of the murders and was arrested the next day. He was charged with four counts of deliberative murder, four counts of felony murder, attempted first degree murder, attempted first degree felony murder, first degree burglary, first degree assault, aggravated robbery, theft and three violent crimes.[2]

### The Legal Proceedings

Dunlap was represented at his murder trial by Forest Lewis and Steve Gayle, whom the judge appointed from a select group of defense lawyers qualified to mount a death penalty defense. Lewis joined the Colorado Public Defender Office in 1974 after graduating from Baylor Law School. At the time of the Dunlap trial he had twenty years of practice representing defendants in several hundred felony cases. He had been the supervising attorney of the Arapahoe Division of the Colorado Public Defender Office, the venue in which the murders occurred, the prosecuting attorneys were based and the trial judge was assigned. Lewis had tried more than fifty first degree murder cases and was counsel in ten other death penalty cases (five of which went to trial, and none of which resulted in a death sentence). He had taught in Colorado and elsewhere at numerous legal education seminars.

Gayle had thirteen years of practice experience, had defended more than one hundred felony cases including fifteen murder cases and had served as head of the Arapahoe Division of

---

[2]  In November 1993, a month before committing the Chuck E. Cheese murders, Dunlap robbed a Burger King restaurant in Aurora, Colorado. While in custody on the Chuck E. Cheese murders, he was charged in connection with the Burger King robbery. The Burger King case was tried before the Chuck E. Cheese case, and Dunlap was convicted of two counts of kidnapping, one count of aggravated robbery, one count of theft and one count of violent crime. This conviction served as an aggravator in the death penalty phase of the instant case and is referred to herein as the Burger King case. Dunlap also filed a habeas corpus petition with respect to the Burger King case, 1:06–cv–611-JLK. The memorandum opinion and order denying that application is published on the same date as this opinion.

the Colorado Public Defender Office. During the Dunlap cases, Gayle had free access to the brief and motions banks dealing with death penalty issues maintained by the Colorado Public Defender.

Though not appearing in the courtroom, Lewis and Gayle were assisted and counseled by David Lane of the Colorado bar, a nationally recognized advocate in criminal and constitutional law cases. Further assistance and support were provided by a team of experienced investigators who, during two years of pretrial investigation, traveled to eight other states (including Florida, Tennessee, Illinois, Michigan, Missouri, North Carolina and Texas) seeking mitigation evidence and interviewing witnesses.

The prosecution endorsed more than 250 witnesses for trial. Jury selection lasted two and one half weeks and the trial took three weeks. At the sentencing hearing, which lasted six days, thirty witnesses testified, including nine for the defense (Dunlap's mother, sister, foster family and probation officer; his mother's co-workers; and the chief investigator for the defense). The post-conviction hearing on the Colorado Rule of Criminal Procedure Rule 35(c) motion, before the same district judge who presided at trial, lasted fifty-two days.

At the penalty phase, the prosecution presented seven aggravating factors in support of a death sentence: (1) Dunlap committed the murders while laying in wait, (2) Dunlap committed the murders in the course of a robbery, (3) Dunlap committed the murders in the course of a burglary, (4) Dunlap committed the murders for pecuniary gain, (5) Dunlap created a grave risk of death to another person, (6) Dunlap committed the murders in order to evade arrest or prosecution and (7) Dunlap was previously convicted of a class 2 felony involving violence.[3] The

_____

[3] The Burger King robbery, described in n.2, *supra*.

prosecution also showed that Dunlap had committed earlier armed robberies, joined a gang and while in prison awaiting trial, obtained a tattoo depicting a smoking gun and the words "By Any Means Necessary." Later, he acquired another tattoo of a horse's head inscribed with the words "Crazy Horse."

At his sentencing, Dunlap argued various mitigating factors, including his young age (nineteen) at the time of the murders, his abusive upbringing and his claim that he suffered from mental illness. Although the defense's case showed that Dunlap had been abused while growing up and that his mother suffered from bipolar disease, the jury sentenced Dunlap to death on each of the four murder counts and to imprisonment of a total of 113 years on consecutive terms for the other counts.

Dunlap appealed his sentence, but he did not appeal his conviction. In a unanimous *en banc* decision, the Colorado Supreme Court denied relief, finding that Dunlap's Chuck E. Cheese murders were "cold-blooded executions" committed "with a brutal contempt for human life." *Dunlap I*, 975 P.2d at 764-65. On October 4, 1999, the U.S. Supreme Court denied *certiorari* and Dunlap's conviction became final. *Dunlap v. Colorado*, 528 U.S. 893 (1999). Pursuant to Colo. R. Crim. P. 35(b), Dunlap filed a motion for sentence reconsideration. The trial judge denied this motion, and in another unanimous *en banc* decision, the Colorado Supreme Court affirmed that decision in late 2001. *People v. Dunlap*, 36 P.3d 778 (Colo. 2001) (*Dunlap II*). While that motion was pending, Dunlap filed an additional plea for post-conviction relief pursuant to Colo. R. Crim P. 35(c). The trial judge denied his motion in July 2004 and the Colorado Supreme Court in a unanimous *en banc* decision affirmed Dunlap's death sentences for a third time in May 2007. *Dunlap v. People*, 173 P.3d 1054 (Colo. 2007) (*Dunlap III*).

Having exhausted all available state remedies, Dunlap filed his initial Petition for Writ of Habeas Corpus (Doc. 1) on February 6, 2008.  After Dunlap's state court post-conviction counsel withdrew from representation, his current counsel filed an Amended Petition for Writ of Habeas Corpus (Doc. 54) on June 11, 2008, which abandoned thirty-five of the original forty-five claims for relief asserted in Dunlap's original Petition.[4]  Respondent answered the Amended Petition on December 28, 2009 (Doc. 67) and Dunlap submitted his Traverse and Reply Brief in Support of his Amended Petition (Doc. 74) on April 1, 2010.

## STANDARD OF REVIEW

I may issue a writ of habeas corpus only when authorized to do so by Congress.  *Ex Parte Bollman*, 8 U.S. 75, 93-94 (1807).  Congress' original authorization was quite broad, permitting issuance of the writ "in all cases," state or federal, "where any person may be restrained of his or her liberty in violation of the constitution, or any treaty or law of the United States;"  *see* Habeas Corpus Act of 1867, ch. 27, 14 Stat. 385 (1867) (codified as amended at 28 U.S.C. § 2254).  Over time, Congress and the U.S. Supreme Court have significantly curtailed the scope and function of habeas corpus review available in federal courts.  *See, e.g.,* Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),  Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified as amended at 28 U.S.C. § 2254); *McCleskey v. Zant*, 499 U.S. 469 (1991) (an individual who has previously filed a habeas corpus petition challenging a conviction may file a subsequent petition presenting a new issue only if he or she can show cause and prejudice from

---

[4]  I commend Dunlap's decision to abandon these claims.  Too often, parties haphazardly pursue every conceivable claim, including ones bordering on frivolity.  It is more effective when, as here, the parties and the court can focus their efforts on those claims which are indeed arguable.  This is, I believe, consistent with the right to representation for all non-frivolous appeals.  *See Anders v. California*, 386 U.S. 738, 741 (1967).

the earlier omission of the issue); *Teague v. Lane*, 489 U.S. 288 (1989) (discussed *infra*); and

*Wainwright v. Sykes*, 433 U.S. 72 (1977) (claims not presented in state court may be raised on

habeas corpus only if there is cause and prejudice).

These federal common law and statutory limitations on habeas corpus review fall into

three independent categories:  findings of law, findings of fact and procedural bars.  Each has its

own standard of review, which I address *seriatim*.

   *1.  Scope of  Habeas Corpus Review:  Findings of Law and Mixed Issues of Law and Fact*

The U.S. Supreme Court has limited the relief available to habeas petitioners challenging

state court findings of law, holding that a petitioner may not seek relief based upon a new rule

unless the rule would be retrospectively applied in all cases.  *Teague*, 489 U.S. at 300.

Accordingly, determining whether a petitioner is asserting a "new rule" and, if so, whether that

rule would be applied retrospectively, are threshold determinations.  The Court announces a new

rule if the result was not dictated by precedent existing at the time the defendant's conviction

became final.  *Id.* at 301.

Where the Court announces a new rule, the rule applies retrospectively to all defendants

only where such rule either (1) places certain kinds of primary, private individual conduct

beyond the power of the criminal law to proscribe; or (2) adopts a procedure that is implicit in

the concept of ordered liberty.[5]  *Id.* at 307, 311.  Thus, as the U.S. Supreme Court held in *O'Dell*

*v. Netherland*, reviewing courts must engage in a three-step inquiry:

---

[5]  The second category is limited to "watershed rules of criminal procedure."  *Teague*,
489 U.S. at 311.  Such rules announce "new procedures without which the likelihood of an
accurate conviction is seriously diminished."  *Id.* at 313.  This exception is applied sparingly; as
the Court noted, "we believe it unlikely that many such components of basic due process have
yet to emerge."  *Id.*

First, the date on which the defendant's conviction became final is determined. Next, the habeas court considers whether a state court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution. If not, then the rule is new. If the rule is determined to be new, the final step in the *Teague* analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine.

521 U.S. 151, 156-57 (1997).

AEDPA partially codified *Teague* and further limited the scope of habeas corpus review of findings of law and mixed issues of law and fact in federal courts.[6] AEDPA provides that where a party is in custody pursuant to the judgment of a state court, habeas relief with respect to claims adjudicated on the merits is only available if the adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

*Contrary to Clearly Established Federal Law*

A decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring in the judgment of the Court and delivering the opinion of the Court as to Part II).

---

[6] AEDPA did not, however, abrogate the *Teague* analysis. "[I]n addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272 (2002) (per curiam).

*Unreasonable Application of Clearly Established Federal Law*

A decision is an unreasonable application of clearly established federal law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ." *Id.* at 407-08. The reasonableness of a decision, *vel non*, is determined by reference to an objective standard.[7] *Id.* at 409.

*Unreasonable Determination of the Facts*

Although the U.S. Supreme Court has failed to define clearly what constitutes "an unreasonable determination of the facts" warranting habeas relief under § 2254(d)(2), it has managed to specify what does <u>not</u>:

> [A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance . . . . [E]ven if reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial judge's determination.

*Wood v. Allen*, 130 S. Ct. 841, 849 (2010) (internal citation, alteration and quotation omitted).

### 2. Scope of Habeas Corpus Review: Findings of Fact

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Where the petitioner has not developed the factual basis of his claim in state court proceedings, the reviewing court may not hold an evidentiary hearing on the claim unless the applicant shows that:

---

[7] Words like "reasonable" are common in our jurisprudence, but rarely defined. Courts issue these standards as if yielding a new level of linguistic precision. For philosopher John Lucas, "the word reasonable had been chosen just because there was no other, more specific term available." J.R. Lucas, *The Philosophy of the Reasonable Man*, 13-51 THE PHIL. Q. 97, 98 (1963).

(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 USCS § 2254(e)(2).

### 3.  Scope of Habeas Review:  Procedural Default

When a petitioner's federal claims are barred in state court by an "adequate and independent" state procedural rule, federal habeas review of those claims is also generally barred.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  If, however, the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," the claims may be reviewed.  *Id.*  With these standards in mind, I turn to Dunlap's claims for habeas corpus relief.

## ANALYSIS

### I.  Ineffective Assistance of Counsel

In Claims 1, 2, 3, 4 and 9 of his Amended Petition for Review, Dunlap asserts various arguments that his trial counsel, Lewis and Gayle, rendered constitutionally defective assistance in violation of his Sixth Amendment right to effective assistance of counsel.  I begin with a summary of the clearly established federal law relating to the Sixth Amendment right to the effective assistance of counsel before addressing the merits of Dunlap's claims.

### Clearly Established Federal Law

The U.S. Supreme Court has long recognized that the right to assistance of counsel

guaranteed by the Sixth Amendment necessarily includes the right to <u>effective</u> assistance. *See,*
*e.g.*, *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). In *Strickland v. Washington*, the
Court elaborated on this right and developed a test for judging claims of constitutional
ineffectiveness. 466 U.S. 668, 686-96 (1984). As the Court noted in *Williams v. Taylor*, "it is
past question that the rule set forth in *Strickland* qualifies as clearly established Federal law, as
determined by the Supreme Court of the United States." 529 U.S. 362, 391 (2000) (citing
*Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring)).

To establish ineffective assistance of counsel in violation of the Sixth Amendment, a
habeas petitioner must first show that his counsel's representation "fell below an objective
standard of reasonableness." *Smith v. Spisak*, 130 S. Ct. 676, 685 (2010) (quoting *Strickland*,
466 U.S. at 688). The Sixth Amendment guarantees only "reasonable competence, not perfect
advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). As
a result, in determining whether counsel's performance conforms to an objective standard of
reasonableness, reviewing courts must be highly deferential, resisting the temptation to employ
the benefit of hindsight to conclude that a particular act or omission of counsel was
unreasonable. *Strickland*, 466 U.S. at 689.

Reviewing courts "judge the reasonableness of counsel's challenged conduct on the facts
of the particular case, viewed as of the time of counsel's conduct" in light of prevailing
professional norms. *Id.* at 690; *see also Williams*, 529 U.S. at 391 (noting that the *Strickland* test
"of necessity requires a case-by-case examination of the evidence"). There is a "strong
presumption" that counsel's performance falls within the range of "reasonable professional
assistance." *Id.* The petitioner has the burden to overcome this presumption by showing the

alleged errors were not sound strategy under the circumstances. *See id.* As the Court noted in *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Thus, where a decision is the result of a conscious, informed choice between two legitimate and rational alternatives, it is presumptively reasonable for purposes of the *Strickland* analysis. *See Wood*, 130 S. Ct. at 849-50; *see also id.* at 853 (Stevens, J., dissenting). Where, however, a decision is the result of "happenstance, inattention, or neglect" it is presumptively unreasonable. *Id.*

Even if a petitioner establishes his counsel's performance was objectively unreasonable, error by counsel alone is insufficient to establish a violation of the constitutional right to effective assistance. A petitioner must also establish that his counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. The petitioner bears the burden of showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In effect, the petitioner must show his counsel's deficient performance rendered "the result of the trial unreliable, or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (citing *Strickland*, 466 U.S. at 687).

Although a petitioner must establish each of these elements, reviewing courts need not address both prongs of the *Strickland* analysis. On the contrary, where it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, reviewing courts should

avoid determining whether counsel's performance was actually deficient.  *Strickland*, 466 U.S. at

697.

## Discussion

### A. Trial Counsel Failed to Conduct a Thorough Mental Health Investigation
### (Dunlap's Claim 1)

Behind every trial lawyer's back lurks the specter of "opening the door."  Whether

through a witness's inadvertence or other circumstance, damaging evidence the lawyer has

succeeded in excluding becomes admissible.  Not only is such evidence damaging itself, but it

also creates in the minds of the triers of fact the ineluctable inference that the lawyer has been

less than candid and cannot be trusted.  Trial counsel must often craft his strategy with these

considerations in mind.  As the court said in *Gardner v. Galetka*:

> After all, there were substantial strategic reasons not to pursue this line of defense
> before the jury:  it would have opened the door to damaging evidence regarding
> the violent acts [the defendant] engaged in during prior offenses while
> uncontestedly in control of his faculties.  This suggests that defense counsel made
> an objectively reasonable strategic decision in not investigating further or
> presenting psychological evidence at trial.

568 F.3d 862, 871 (10th Cir. 2009) (emphasis added).

So, too, the Colorado Supreme Court in *Davis v. People* recognized that a decision to

forego investigation of potential character witnesses in a death penalty case was strategic and

supported by reasonable professional judgment that "such avenues would be more damaging

than helpful."  871 P.2d. 769, 774 (Colo. 1994).  By not introducing such evidence, defense

counsel prevented the prosecution from presenting far more damaging details in rebuttal and

allowing foreseeably devastating cross-examination.

Dunlap argues his trial counsel failed adequately to investigate his mental health as a

source of mitigation, and that such conduct fell below an objective standard of reasonableness and was constitutionally deficient.  The Colorado Supreme Court determined that trial counsel's "limited mental health mitigation investigation was supported by reasonable professional judgment."  *Dunlap III*, 173 P.3d at 1068.  Dunlap contends the Colorado Supreme Court unreasonably applied clearly established federal law in reaching this result.  I disagree.

Dunlap was arrested on December 15, 1993.  For the first two months in jail following his arrest, he behaved normally.  After conferring with Lewis on February 14, 1994, Dunlap visited the jail's law library to research habeas writs.  Thereafter, he began acting in a deranged manner.  Lewis filed an *ex parte* motion to have Dunlap examined by a confidential defense expert.  The judge to whom pretrial motions were then assigned denied the motion.  Lewis did not file a motion for a competency evaluation at the Colorado State Hospital because, in his experience, a great deal of material would be generated for the prosecution which it would not otherwise have.  Over Lewis' objection, the motions judge ordered Dunlap to be transferred to the state hospital.

Dunlap's behavior at the state hospital demonstrated malingering, assaultiveness and abusive and demeaning treatment of weaker patients and inmates, and included threats to hospital staff and admissions that he had no remorse for the victims of the Chuck E. Cheese homicides.  As Lewis testified at Dunlap's post-conviction hearing, "The state hospital records in this case were probably the most consistently damaging and consistently negative and consistently devastating set of reports I have ever seen . . . .  I have never in a set of records from the state hospital seen so little to work with and so much to run from."  He further testified, "My plan was to prevent it from being introduced in the first place, which we were able to do."

Although *Strickland* provides the clearly established federal law for this claim, it is useful to consider other cases in which the U.S. Supreme Court has discussed counsel's duty to investigate mental health as a source of mitigation. In *Williams v. Taylor*, the Court found constitutionally deficient counsel's failure to investigate and uncover juvenile records revealing defendant's nightmarish childhood "not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. 362, 395 (2000). Significantly, although some of the evidence contained in those records was unfavorable to Williams, counsel's failure to introduce this evidence could not be justified by a tactical decision to focus on defendant's voluntary confession because counsel had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background." *Id.* at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)).

Similarly, in *Wiggins v. Smith*, the Court focused not on "whether counsel should have presented a mitigation case" but rather on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background <u>was itself reasonable</u>." 539 U.S. 510, 523 (2003) (emphasis in original). In articulating this distinction, the Court noted that "a cursory investigation [does not] automatically justif[y] a tactical decision with respect to sentencing strategy." *Id.* at 527. Instead, the Court focused on the reasonableness of the investigation said to support that strategy. *Id.* Applying these standards, the Court found that counsel "abandon[ed] their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28. Specifically, the Court found unreasonable counsel's failure to order a social history report for which funds had been allocated, especially in light of evidence counsel had discovered in their

limited investigation. *Id.* at 527.

In *Rompilla v. Beard*, the Court found objectively unreasonable counsel's failure to investigate the contents of a prior conviction file for an offense which the prosecution intended to use as aggravating evidence at the sentencing phase. 545 U.S. 374 (2005). Significantly, in finding this failure prejudicial under *Strickland's* second prong, the Court noted "if the defense lawyers had looked in the file on [defendant's] prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up." *Id.* at 391.

Most recently, in *Sears v. Upton*, the Court found deficient a cursory investigation which was limited to "one day or less, talking to witnesses selected by [defendant's] mother." 130 S. Ct. 3259, 3264 (2010). The Court specifically noted counsel's failure to discover evidence of a troubled upbringing, behavioral problems and substantial deficits in mental cognition and reasoning. *Id.* at 3262-64. Relying heavily on its ruling in *Williams v. Taylor*, the Court found counsel's failure to conduct an adequate investigation undermined any "strategic" or "tactical" justification. *Id.* at 3265. Finding counsel's failure prejudicial, the Court reiterated that "[t]he 'reasonableness' of counsel's theory [is], at [the prejudice] stage in the inquiry, beside the point." *Id*. As these cases make clear, in order to be reasonable, a strategic decision must be based upon adequate investigation. In the mitigation context, this means counsel is, at a minimum, required to conduct a mitigation investigation and follow up on obvious leads.

In dismissing Dunlap's claim that Lewis failed to conduct a thorough mental health investigation, the Colorado Supreme Court distinguished *Williams*, *Wiggins* and *Rompilla*, stating, "[t]his is not a case where defense counsel failed to conduct a mitigation investigation altogether, failed to follow-up on an obvious lead, or failed to investigate the prosecution's

evidence of aggravation." *Dunlap III*, 173 P.3d at 1065.  Dunlap asserts this ruling constitutes an unreasonable application of clearly established federal law.

As Dunlap acknowledges, Lewis knew of his mother's history of bipolar disorder and had obtained school, medical and juvenile records "raising serious concerns about [his] mental health."  Am. Pet. (Doc. 54) at 95.  According to Dunlap, this knowledge should have prompted additional investigation, and Lewis failed "to follow up on a host of obvious leads relating to Mr. Dunlap's mental health, and . . . failed to investigate mental health issues as an obvious and necessary response to the prosecution's penalty-phase evidence."  *Id.* at 93.  Completing the syllogism, Dunlap argues Lewis' "strategic decision" was not based upon a reasonable investigation and constituted constitutionally deficient representation.

Dunlap's argument, however, fails on two counts.  First, the fact that Lewis conducted an investigation and discovered some evidence of mental health problems supports the Colorado Supreme Court's finding that his strategic decision to abandon further investigation of mental health evidence was well-informed.  Second, Dunlap's argument that his counsel failed to investigate mental health issues is belied by the record.  In preparation for the penalty phase of trial, Lewis engaged in an extensive investigation of mitigation evidence and secured the services of a private investigator to aid in the development of mitigation evidence.   As Dunlap notes, this investigation revealed evidence of Dunlap's troubled childhood and his mother's history of mental illness.  Dunlap ignores the fact that, in response to these findings, Lewis also secured the services of two independent mental health professionals, Dr. Robert Fairbairn and Dr. Rebecca Barkhorn, who failed to diagnose any major mental illness.[8]  Lewis' strategic

---

[8]  Lewis did not provide Dr. Barkhorn with the complete records from Dunlap's hospitalization at the state hospital.  His decision not to do so was reasonable in light of his

decision to avoid presenting mitigation evidence which would open the door to extremely harmful evidence generated during Dunlap's stay at the state hospital was, contrary to Dunlap's argument, based upon a reasonable investigation. This evidence included a diagnosis that Dunlap's behavior was most likely volitional (i.e., malingering), his abusive behavior toward staff and other patients and his statements showing a lack of remorse from the Chuck E. Cheese victims. Dunlap argues that this evidence was merely cumulative and would not have significantly altered the case before the jury at the penalty phase. On the contrary, this evidence differed significantly from that presented by the prosecution at the penalty phase and Lewis succeeded in keeping it out.

Lewis' decision to abandon further investigation of mental health evidence was entirely reasonable. More importantly, the Colorado Supreme Court's determination that Lewis' performance was objectively reasonable was itself a reasonable application of clearly established federal law.

### B. Trial Counsel Failed to Present a Coherent and Consistent Theory of Defense at the Guilt/Innocence and Penalty Phases (Dunlap's Claim 2)

Dunlap next argues his trial counsel failed to present a coherent and consistent theory of defense at the guilt/innocence and penalty phases of his trial. Specifically, he alleges his trial counsel provided ineffective assistance as a result of their failure to: (1) present a coherent theory of defense; (2) present witnesses and evidence promised in their opening statements; (3)

---

larger strategic decision to keep out the evidence of malingering, bad conduct and damaging statements during Dunlap's stay at the institution. A real danger existed that, had Dr. Barkhorn been provided with the records, she might have inadvertently opened the door which Lewis wanted to keep tightly shut. Dr. Barkhorn's post-conviction diagnosis of bipolar disorder does not alter the reasonableness of Lewis' decisions at the time they were made. It is also noteworthy that Dr. Barkhorn's post-conviction opinions included a proviso that she found no evidence to suggest Dunlap was mentally impaired when he murdered the four victims.

explain why Dunlap chose not to plead guilty; and (4) present evidence of the security features used at the Colorado State Penitentiary. Applying *Strickland*, the Colorado Supreme Court found counsel's performance objectively reasonable, and, in the alternative, nonprejudicial to Dunlap's defense. Dunlap argues that this ruling was both an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the record. I conclude the Colorado Supreme Court reasonably applied the *Strickland* analysis and the facts in the record in denying Dunlap's claim for habeas relief.

### 1. Failure to Present a Coherent Theory of Defense

According to Dunlap, his trial counsel failed to formulate a coherent theory of defense in the guilt/innocence and penalty phases of his trial. The Colorado Supreme Court found that Dunlap's trial counsel had in fact pursued a consistent and coherent strategy at both phases of the trial. I agree.

Dunlap's argument is made of whole cloth. To preserve credibility with the jury at the penalty phase, Gayle and Lewis divided their responsibilities for the opening statements, with Gayle opening in the guilt/innocence phase and Lewis opening in the penalty phase. This bifurcation of roles and the resulting opening statements were neither inconsistent nor incoherent. The two openings indeed dovetailed. Lewis echoed Gayle's opening in requesting the jury to look at the prosecution's evidence as well as the defendant's witnesses with an eye to Dunlap's family influence and upbringing. Moreover, in the penalty phase the defense called nine witnesses, "most of whom testified about the Dunlap household." *Dunlap III*, 173 P.3d at 1062.

Dunlap argues the Colorado Supreme Court unreasonably applied clearly established federal law. Quoting the 1989 version of the American Bar Association's Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases, Dunlap argues that "in [formulating a defense theory], counsel should consider both the guilt/innocence phase and the penalty phase, and seek a theory that will be effective through both phases."[9]  Dunlap argues that, after abandoning a trial strategy focusing on Dunlap's mental illness, the only strategy developed by his trial counsel was the separation of duties between the guilt/innocence and penalty phases of his trial.  According to Dunlap, this strategy was not "effective through both phases" and constituted objectively unreasonable performance under the cited ABA Guidelines.  In support of this argument, Dunlap cites the alleged inconsistency between what he describes as Gayle's focus in his guilt/innocence phase on a misidentification defense and Lewis' focus on mitigation.

As a threshold matter, although the ABA guidelines "are guides to determining what is reasonable . . . they are only guides."  *Strickland*, 466 U.S. at 688 (emphasis added).  Under *Strickland*, although such guidelines inform the inquiry, the ultimate determination of the reasonableness of counsel's challenged conduct must be based on the facts of each case. Even accepting these as the appropriate guidelines for judging the performance of Dunlap's trial counsel, the Colorado Supreme Court's finding is reasonable.

In dismissing Dunlap's claim for relief, the Colorado Supreme Court found Dunlap had "misrepresent[ed] both the theme of the defense opening and the record" relating to Gayle's

_____

[9]  Dunlap also relies upon the 2003 version of the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines).  As the U.S. Supreme Court recently clarified in *Bobby v. Van Hook*, such guidelines are useful "only to the extent they describe the professional norms prevailing when the representation took place."  130 S. Ct. 13, 16 (2009) (finding improper the 6th Circuit's reliance on guidelines published eighteen years after trial counsel's challenged conduct).  Because the 2003 ABA Guidelines post-date the challenged conduct of Dunlap's trial counsel by eight years, they are not relevant to Dunlap's petition for habeas relief.

performance at the guilt/innocence phase. Contrary to Dunlap's assertion, it found "[t]he predominant defense theme during the opening statement was that the jury needed to fairly and objectively evaluate the evidence and hold the People to their burden of proof."[10] *Dunlap III*, 173 P.3d at 1076. In his opening statement, Gayle asked the jury for a "dispassionate, calm and fair evaluation of the evidence," "a fair evaluation of the State's case," and to "approach [its] job in a critical and fair way" and the testimony of the prosecution witnesses "with caution." Vol. 73, pp. 75, 79, 86. These statements provide ample basis for the Colorado Supreme Court's characterization of the theme of Gayle's opening. Most importantly, this theme is entirely consistent with Lewis' strategy in the penalty phase, which focused on offering evidence in support of mitigation factors which Dunlap undoubtedly hoped the jury would fairly and objectively evaluate.

It is unsurprising yet revealing that Dunlap fails to adduce any alternative defense strategy; I am unable to imagine one in light of the facts and circumstances in this case. In any event, the Colorado Supreme Court's findings on this claim were a reasonable application of clearly established federal law.

   2. *Failure to Present Witnesses and Evidence Promised in Opening Statements*

Dunlap argues that his trial counsel failed to present witnesses and evidence which he alleges they repeatedly promised to present during the guilt/innocence and penalty phase opening statements. Neither the U.S. Supreme Court nor the 10th Circuit have addressed whether the failure to introduce a witness or evidence promised during an opening statement constitutes

---

[10] This formulation of the strategy is consistent with trial counsel's decision not to call any witnesses at the guilt/innocence phase. Instead of aggressively pursuing an actual innocence defense, counsel attempted to explore issues of mistaken identity on cross-examination of the prosecution's witnesses.

ineffective assistance of counsel *per se*. A number of other courts have addressed this issue, but they do not establish a consistent case law on this issue.[11] *See Williams v. Bowersox*, 340 F.2d 16, 17 (1st Cir. 1988) (collecting and summarizing cases). This diversity of opinion leaves the impression that reasonable jurists may disagree on the proper resolution of this issue.

In resolving this claim, the Colorado Supreme Court acknowledged that, in relation to a misidentification defense, Gayle mentioned two potential witnesses by name in his opening statement in the guilt/innocence phase who were never called at trial. It found, however, that this was the result of a "determination after the trial began that it would be better not to call any witnesses." *Dunlap III*, 173 P.3d at 1076. It dismissed Dunlap's arguments relating to the penalty phase opening argument, finding that although Gayle had "stated a possibility that expert testimony and academic studies would be presented, he neither dwelt on the possible evidence, nor unconditionally promised it would be introduced." *Id.* at 1077. The Colorado Supreme Court also found that, at the time of the opening statement, trial counsel was still considering calling a retained expert (Dr. Barkhorn) to the stand. *Id.*

Dunlap first argues that the Colorado Supreme Court's decision rests upon an unreasonable determination of the facts in light of the record. Relating to the guilt/innocence phase of his trial, Dunlap asserts Gayle failed to offer any explanation for his failure to call the witnesses mentioned in the opening. In regard to the penalty phase, Dunlap argues Lewis' failure to fulfill his "promises" was not justified by any strategic decision.[12] In both instances,

---

[11] Although these decisions do not make a legal principle "clearly established federal law" for purposes of habeas review under § 2254, they do provide significant insight and guidance into what constitutes objectively reasonable conduct in similar circumstances.

[12] Dunlap draws attention to Lewis' failure to call his brother, Garland Dunlap, to offer testimony relating to the abuse suffered by Dunlap and expert witnesses to offer testimony about

Dunlap asserts these failures fell below an objective standard of reasonableness and prejudiced his defense, constituting ineffective assistance of counsel under *Strickland*.

Dunlap's arguments are unpersuasive. During the guilt/innocence phase, Gayle was forced to walk a tightrope between aggressively advocating Dunlap's actual innocence (which would have been, as Dunlap notes, inconsistent with the mitigation strategy employed during the penalty phase and indeed incredible in the face of the clearly established facts) and abandoning his client. I find the decision not to call any witnesses and to focus instead upon establishing residual doubt through aggressive cross-examination of the prosecution's witnesses to be consistent with a strategy of preserving counsel's credibility. With regard to the penalty phase, Dunlap's argument that Lewis "promised" anything is belied by the text of the opening statement. Although Lewis repeatedly stated that evidence in support of mitigation "may" come from numerous sources, he did not promise to offer evidence in any specific form. Dunlap's argument to the contrary is, therefore, specious. There is ample evidence supporting the reasonableness of the Colorado Supreme Court's determination of the facts on this issue.

Dunlap also argues the Colorado Supreme Court unreasonably applied clearly established federal law in dismissing his claim for relief on this issue. Under *Strickland*, the court was obligated to determine the reasonableness of trial counsel's performance in light of the facts and circumstances of the case at the time of the challenged conduct. Because the Colorado Supreme Court's decision rejecting trial counsel's "failure" to call "promised" witnesses was objectively reasonable, it logically follows that its determination of the reasonableness under the *Strickland* merits prong is a correct application of clearly established federal law.

--------

the effects of child abuse.

### 3. Failure to Explain Why Dunlap Chose Not to Plead Guilty

Dunlap next argues that his trial counsel's failure to explain why he chose not to plead guilty constitutes ineffective assistance. In closing argument at the penalty phase the prosecutor suggested to the jury that Dunlap chose not to plead guilty because the state refused to limit his potential sentence to life without parole. Dunlap asserts Lewis should have explained why Dunlap chose not to plead guilty, especially after the prosecutor raised it in his closing. As a threshold matter, it is necessary to determine whether, as Respondent argues, this claim has been procedurally defaulted.

I may not entertain a claim for habeas relief which a petitioner has been or is procedurally barred from presenting to state courts because he failed to comply with state rules of procedure. *See Coleman*, 501 U.S. at 734 n.1. Because the Colorado Supreme Court did not address trial counsel's failure to either explain why Dunlap chose not to plead guilty or object to the prosecution's characterization of this decision in *Dunlap III*, Respondent urges that this sub-claim was not exhausted in the state court proceedings and is procedurally barred from federal habeas review.

As Dunlap explains in his Traverse and Reply, however, he did raise this argument in his Rule 35(c) motion to the trial court. *See* Rule 35(c) Motion (Doc. 6-10) at 139-141. The trial judge found Lewis' failure to object to the prosecutor's remark to be objectively unreasonable, but dismissed the claim on *Strickland's* prejudice prong. Dunlap appealed this no-prejudice finding to the Colorado Supreme Court, but the court failed to reach it. Instead, it determined that the prosecution's closing argument was proper and never reached the issue of whether Lewis' failure to object constituted ineffective assistance. Indeed, had the prosecution's closing been proper, no objection would lie. The Colorado Supreme Court's failure to address this claim

was not based upon any state procedural bar. Accordingly, I find this claim is not procedurally barred on federal habeas review and turn to its merits.

Dunlap argues Lewis should have explained why Dunlap chose not to plead guilty in support of one of the statutory mitigating factors, cooperation with law enforcement, presented at the penalty phase. According to Dunlap, the reason he chose not to plead guilty was because had he done so he would not have been entitled to a sentencing hearing in front of a jury. He argues that his counsel's failure to offer this explanation prejudiced his defense. Compounding this error, Dunlap argues, Lewis failed to object to erroneous testimony to the contrary elicited by the prosecution in its cross-examination of Dunlap's chief witness on this mitigating factor. Contrary to Colorado law at the time of Dunlap's sentencing, this testimony represented that Dunlap would have been entitled to a sentencing hearing in front of a jury even if he had pled guilty.[13] *See* Colo. Rev. Stat. § 18-1.3-1201(1)(a) (2006). For its part, Respondent notes there is no trial court finding of fact that this was Dunlap's true reason for not pleading guilty.

Even if this were Dunlap's actual reason for not pleading guilty, and assuming *arguendo* that his trial counsel's failure to offer this explanation and/or object to the prosecution's cross-examination of Dunlap's witness in chief was objectively unreasonable, I cannot say that this deficiency prejudiced Dunlap's defense.[14] As has been discussed, the evidence presented by the prosecution at the guilt/innocence and penalty phases was overwhelming. At the penalty phase,

---

[13] The Colorado Supreme Court recently held this aspect of Colorado's death penalty scheme unconstitutional, but it remained in effect when Dunlap went to trial. *See People v. Montour*, 157 P.3d 489, 491 (Colo. 2007).

[14] In accordance with the U.S. Supreme Court's directive in *Strickland*, because this claim is most easily resolved on grounds of prejudice, I do not reach the issue of whether or not counsel's performance was objectively unreasonable. *See Strickland*, 466 U.S. at 697.

the prosecution presented evidence of seven statutory aggravators supporting the death penalty. Although evidence of Dunlap's cooperation (and his consideration of a guilty plea) was one of only three mitigating factors offered by his trial counsel, this was not sufficient to establish a reasonable probability that, but for trial counsel's alleged error, the result of the proceeding would have been different. On the contrary, the jury undoubtedly would have reached the same result had it weighed this mitigating factor in Dunlap's favor. Indeed, as the trial judge noted in his Rule 35(c) decision, it is unlikely that any juror "would be surprised if a defendant attempted to avoid a death sentence by seeking a negotiated settlement of the case." *People v. Dunlap*, Case No. 93CR2071 at 226. Because there is no prejudice, Dunlap is not entitled to relief on this claim.

### 4.  *Failure to Present Evidence of the Security Features Used at the Colorado State Penitentiary*

Dunlap argues Lewis' failure to introduce into evidence a video detailing the stringent security features and living conditions at the Colorado State Penitentiary ("CSP") constitutes ineffective assistance of counsel. The Colorado Supreme Court found this "failure" was actually the result of a strategic decision within "the wide range of reasonable professional assistance." *Dunlap III*, 173 P.3d at 1075 (quoting *Strickland*, 466 U.S. at 689). Lewis and Gayle chose not to introduce this video because "they did not think the tape would 'weigh heavily' in the jury's sentencing decision" and the defense team feared introduction of a counter-video prepared by the prosecution detailing the living conditions at a less secure facility would "raise a question in the jurors' minds of whether Dunlap would be permanently housed at CSP." *Id.* In his Amended Petition, Dunlap argues that the rebuttal value of the prosecution's videotape was limited and counsel's failure to introduce the CSP tape was not based on any strategic justification.

Applying the deferential standard of review required by *Strickland*, I cannot say trial

counsel's decision was unjustified. On the contrary, the reasons offered provide sufficient basis for a decision not to introduce the CSP tape into evidence.[15] No matter how "limited," the potential use of the rebuttal videotape was a fact upon which a strategic choice was based. Furthermore, I cannot say that this "failure," even if objectively unreasonable, prejudiced Dunlap's defense in light of the overwhelming evidence presented by the prosecution in support of his guilt and sentence. The Colorado Supreme Court reasonably applied clearly established federal law.

### C. Trial Counsel Abandoned Dunlap During the Penalty-Phase Closing Argument (Dunlap's Claim 3)

Dunlap next argues Lewis abandoned him in his penalty-phase closing argument. The Colorado Supreme Court determined the closing argument was sufficient and, in the alternative, even if the closing were improper, it did not prejudice Dunlap's defense. Dunlap argues the Colorado Supreme Court unreasonably applied clearly established federal law in reaching this conclusion. Based on the following discussion, the Colorado Supreme Court reasonably applied clearly established federal law in determining that trial counsel's performance met an objective standard of reasonableness.

Although the right to effective assistance extends to closing arguments; *see Yarborough v. Gentry,* 540 U.S. 1, 7 (2003); *Bell v. Cone,* 535 U.S. 685, 701-702 (2002); when trial counsel makes a tactical decision, based on facts, strategy and reasoning, it is accorded great deference on review. *Strickland,* 466 U.S. at 689. Every effort must be made to avoid the harsh distortion

---

[15] Respondent also argues that prison condition evidence is not admissible capital mitigation evidence. Because the Colorado Supreme Court's application of the *Strickland* analysis was a reasonable application of clearly established federal law, I do not reach this argument.

of hindsight and to consider, instead, the facts from trial counsel's position at the time of the decision. *Id.* The temptation to engage in "Monday morning quarterbacking" cannot be indulged. Because of the broad range of acceptable strategies that counsel may adopt, this is especially true when considering a closing argument. *Yarborough*, 540 U.S. at 6.

The Colorado Supreme Court determined Lewis' use of a considered strategy in crafting his closing remarks met the reasonable standard required of him. *Dunlap III*, 173 P.3d at 1079. It found Lewis chose to maintain credibility with the jury by acknowledging the horror of Dunlap's crimes and to show sympathy for Dunlap's victims to compensate for his client's total lack of remorse. *Id.* Specifically, the court found Lewis spent the bulk of his time "surveying the mitigation evidence" and attempting to show that each element of Dunlap's life provided a "bit and piece" of an explanation that made him worthy of life. *Id.* at 1078. Most importantly, the Colorado Supreme Court found, "[r]eading the closing as a whole. . . Lewis clearly had a strategy." *Id.*

The Colorado Supreme Court's ruling is consistent with U.S. Supreme Court precedent. In *Yarborough*, trial counsel's decision not to make certain arguments was not ineffective assistance because it was the result of a strategic choice. 540 U.S. at 7. Here, Dunlap argues the arguments selected by Lewis demonstrate abandonment. Am. Pet. (Doc. 54) at p. 114. In making his claim, however, Dunlap's argument is premised on individual quotations taken entirely out of context. Reading the record as a whole, Lewis adopted a thoughtful strategy to attempt to relate to the jury, maintain credibility and mitigate Dunlap's lack of remorse. When counsel focuses on one strategy or argument to the exclusion of others, there is a strong presumption that he did so for tactical reasons and not out of neglect. *Yarborough*, 540 U.S. at 7. Dunlap also argues that Lewis was ineffective because he did not plead for Dunlap's life. This accusation is simply

untrue.  The Colorado Supreme Court disagreed with Dunlap's contention, citing the closing

words of Lewis' summation:

> [I]n the final analysis you're called on to make a choice. Nathan Dunlap chose to
> kill. He should be held accountable for it. He has been accountable for it . . . . You
> have a choice now, too. Choose life, life in prison without any possibility parole,
> but life. Not violence, not killing, but life.

*Dunlap III*, 173 P.3d at 1079. Even if Lewis had failed to make such a plea to the jury,

this would not necessarily constitute ineffective assistance of counsel.  Failing to tell

the jury what it should do or to make an impassioned plea is a legitimate choice, and

the reviewing court should accord it proper deference. *Yarborough*, 540 U.S. at 10-11.

Lewis legitimately chose to focus on the mitigation elements of Dunlap's upbringing,

attempted to place his heinous crimes in context, and tried to relate to the jurors rather than

isolate or command them. That choice was not unreasonable. Thus, there was nothing

unreasonable about the Colorado Supreme Court's finding that this strategy met *Strickland*'s

standard of reasonableness.  Furthermore, because Lewis' performance was constitutionally

sufficient, it could not have prejudiced Dunlap's verdict. Therefore, the Colorado Supreme Court

did not rule contrary to or unreasonably apply clearly established federal law when it found trial

counsel was effective.

### D.  Trial Counsel Had an Actual Conflict of Interest (Dunlap's Claim 4)

Dunlap argues Lewis had an actual, nonwaiveable conflict of interest that deprived him

of his Sixth Amendment right to counsel.  Specifically, Dunlap complains that Lewis (1)

represented Miguel Kirkpatrick, a state witness, in an unrelated criminal matter one-and-a-half

years before the Chuck E. Cheese trial, and (2) provided to Kirkpatrick's attorney a letter

Kirkpatrick had written to Dunlap.  Finding that Dunlap failed to demonstrate the existence of

either a nonwaiveable or actual conflict of interest, the Colorado Supreme Court upheld the trial judge's denial of Rule 35(c) relief. Dunlap argues this decision was contrary to, and an unreasonable application of, clearly established federal law. Again, I disagree.

The Sixth Amendment right to counsel encompasses a "right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). In this context, "conflict of interest" means counsel conducted a defense that "actually" and "actively" was subject to the influence of "divided loyalties" that operated to the defendant's detriment. *Mickens v. Taylor*, 535 U.S. 162, 168-69, 172 n.5, 175 (2002). Even if a conflict of interest is otherwise improper, "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests." *Holloway v. Arkansas*, 435 U.S. 475, 483 n.5 (1978). Courts will, however, "indulge every reasonable presumption against the waiver of fundamental rights." *Glasser v. United States*, 315 U.S. 60, 70 (1942).

Claims for ineffective assistance are usually governed by the *Strickland* framework. The U.S. Supreme Court has, however, recognized a series of limited exceptions in cases where an attorney concurrently represents multiple defendants. *See Mickens v. Taylor*, 535 U.S. 162, 167-172 (summarizing the Court's rulings in *Wood v. Georgia*, 450 U.S. 261 (1981); *Cuyler v. Sullivan*, 446 U.S. 335 (1980); and *Holloway v. Arkansas*, 435 U.S. 475 (1978)). Most relevant to Dunlap's claim, in *Cuyler* the Court held that absent an objection at trial, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." 446 U.S. at 349-50. As the Supreme Court later clarified, however, the *Cuyler* exception to *Strickland* only applies "if the conflict has significantly affected counsel's performance – thereby rendering the verdict unreliable, even though *Strickland* prejudice cannot be shown." *Mickens*, 535 U.S. at 173.

Although the Colorado Supreme Court assumed *Cuyler* applied to Dunlap's petition for Rule 35(c) relief, it also correctly acknowledged that "[t]he Supreme Court has made it clear that it is an open question whether applying the *Cuyler* exception to conflicts other than multiple concurrent representation is proper, or whether the normal *Strickland* analysis applies." *Dunlap III*, 173 P.3d at 1073 n.24 (citing *Mickens*, 535 U.S. at 174-76). In light of *Mickens*, *Cuyler* applies to cases involving concurrent representation of multiple clients; its application in other circumstances is not clearly established federal law. Because Lewis did <u>not</u> engage in multiple concurrent representation, *Cuyler* does not pertain to Dunlap's habeas claim; *Strickland* applies. The difference, however, is inconsequential. Because the Colorado Supreme Court dismissed Dunlap's Rule 35(c) claim applying a lesser standard, it would have necessarily dismissed Dunlap's Rule 35(c) claim had it applied the more stringent *Strickland* analysis. Having resolved this apparent discrepancy, I now turn to the substance of the Colorado Supreme Court's decision.

The Colorado Supreme Court relied upon several findings in dismissing Dunlap's conflict of interest claim. It found that (1) Lewis promptly filed a motion to withdraw as Kirkpatrick's counsel after he learned of a failed joint escape attempt by Dunlap and Kirkpatrick; (2) Kirkpatrick waived the attorney-client privilege between Lewis and himself; (3) Dunlap stated numerous times on the record that Lewis was his counsel of choice; and (4) Dunlap, with the assistance of independent court-appointed counsel, Jeffrey Pagliuca, voluntarily, knowingly and intelligently waived his right to conflict-free counsel. It also rejected Dunlap's arguments that his waiver had not been fully informed and that Lewis demonstrated an actual conflict of interest by producing evidence against him to assist Kirkpatrick. In denying this claim, Dunlap asserts the Colorado Supreme Court ruled contrary to, and unreasonably applied, clearly

established federal law.

Dunlap first argues that Lewis' previous representation of Kirkpatrick constitutes an actual conflict of interest mandating reversal. Because *Cuyler* is inapplicable, Dunlap must show both that an actual conflict of interest existed and that it prejudiced his defense. I review that portion of the Colorado Supreme Court's ruling which comports with the merits prong of the *Strickland* analysis.

Dunlap focuses on Lewis' mailing to Kirkpatrick's counsel the "jailhouse letter" sent by Kirkpatrick to Dunlap.[16] This letter expresses Kirkpatrick's anger with Dunlap because Dunlap had put a "snitch jacket" on him.[17] According to Dunlap, Lewis produced the letter to further the interests of Kirkpatrick, who benefitted in a plea bargain resulting from his agreement to testify against Dunlap at the Chuck E. Cheese trial. Dunlap's claim that Lewis produced the letter to advance his former client's interest is speculative and conjectural. Indeed, it is inconsistent with Lewis' diligence in withdrawing from representing Kirkpatrick as soon as he discovered that a potential conflict existed. Arguably, the letter may have bolstered Kirkpatrick's efforts to obtain a favorable plea bargain, but it did not contain significant evidence against Dunlap. Though not raised by Respondent, it is equally arguable that the letter demonstrates Kirkpatrick's animus against Dunlap for putting a snitch jacket on him. Finally, as the Colorado Supreme Court noted, Dunlap's argument that producing evidence against one's client is *per se* an actual conflict of interest is unsupported by any legal authority. The Colorado Supreme Court's

---

[16] There are significant discrepancies between the parties' briefing regarding the source of the letter and the circumstances of its delivery. For purposes of this decision, I accept Dunlap's version of the facts.

[17] This is a term commonly used by inmates and corrections personnel, the import of which is that the inmate so labeled is an informant.

conclusion that there was no actual conflict of interest is eminently reasonable and Dunlap's claim for habeas relief is denied.

Assuming *arguendo* that Lewis' representation was constitutionally deficient, Dunlap's claim is nonetheless without merit if Dunlap knowingly, intelligently and voluntarily waived his right to conflict-free counsel. Noting that (1) Jeffrey Pagliuca's appointment as independent counsel to assist Dunlap "ensured that Dunlap received independent advice regarding the possible conflict," *Dunlap III*, 173 P.3d at 1072-73; (2) the trial judge properly questioned Dunlap before accepting Dunlap's waiver; and (3) Dunlap repeatedly stated on the record that Lewis was his counsel of choice, the Colorado Supreme Court found that the conflict was waiveable and the trial judge properly accepted Dunlap's waiver.

Dunlap argues that the independent counsel appointed to advise him on the conflict issue was not himself fully informed of the consequences of Dunlap's waiver. Specifically, he notes comments made by the trial judge in regard to the potential conflict. According to Dunlap, the trial judge stated that Kirkpatrick would not be allowed to testify if Dunlap refused to waive his right to conflict-free counsel.

This inaccurately characterizes the trial judge's statements. Although the judge indicated a willingness to consider barring Kirkpatrick's testimony, he specifically and emphatically disclaimed any ruling on the matter. Because the Colorado Supreme Court found Lewis correctly understood that the judge did not rule that Kirkpatrick could not testify, there was no basis or reason for him to inform Pagluica of the judge's comments. Accordingly, there is no basis for finding Dunlap's waiver anything but knowing, intelligent and voluntary.

*E. Trial Counsel Failed to Exhaust Peremptory Challenges (Dunlap's Claim 9)*

Dunlap's final claim relating to his trial counsel's effectiveness relates to Lewis' failure to exhaust peremptory challenges, thereby barring any appeal of the trial court's denial of Dunlap's for-cause challenges to prospective jurors. Although there is no clearly established federal law on this point, a number of courts have addressed whether the failure to exhaust peremptory challenges constitutes ineffective assistance of counsel.

In *United States v. Taylor*, while noting that the failure to exercise peremptory challenges could in some cases give rise to a claim of ineffective assistance of counsel, the 10th Circuit found "the use of peremptory challenges to construct a fair and impartial jury panel will normally fall squarely within the realm of a tactical trial decision." 832 F.2d 1187, 1196 (10th Cir. 1987). The 10th Circuit has acknowledged a general deference to counsel's actions during voir dire, noting that they "are considered to be matters of trial strategy, which cannot be the basis of an ineffective assistance claim unless counsel's decision is so ill-chosen that it permeates the entire trial with obvious unfairness." *DeLozier v. Sirmons*, 531 F.3d 1306, 1323 (10th Cir. 2008).

Analysis of Dunlap's claim falls within *Strickland*'s framework. Lewis testified he made a conscious, well-informed decision not to exhaust his peremptory challenges. To prevail, Dunlap must establish not only that other possible choices were reasonable, but that Lewis' decision was not sound strategy.

In dismissing Dunlap's claim for Rule 35(c) relief, the Colorado Supreme Court found Lewis "knew which prospective jurors were next in line and determined that they were unacceptable to the defense." *Dunlap III*, 173 P.3d at 1084-85. Accordingly, it determined Lewis' failure to exhaust peremptory challenges was not due to inadvertence, but the result of a

conscious strategic decision to accept the jury as it was composed.  Dunlap argues this decision

rests upon an unreasonable application of clearly established federal law.  Although

acknowledging lead trial counsel's stated rationale, Dunlap notes the disagreement with this

strategy expressed by his other trial counsel, Gayle.  Dunlap also argues the asserted rationale is

belied by Lewis' actions and the jury's ultimate composition.

In the first place, unanimity in making strategic decisions during trial is not required.  In

fact, counsel had agreed before trial that Gayle would lead in the guilt/innocence phase, and

Lewis would lead in the penalty phase.  The peremptory challenges at issue relate to the penalty

phase and therefore Lewis appropriately made the call.

More significantly, the defense team's conduct of jury selection was a model of expert-

level criminal defense practice.  Lewis and Gayle used a thirteen-page, eighty-six-item

questionnaire for the entire jury venire.  Their investigators accessed computer databases, viewed

prospective jurors' homes and neighborhoods, devised individual profiles and used a scoring

system which incorporated nonverbal communications.  Lewis and Gayle conducted individual

and group voir dires and had at least two lawyers and two lay people rate the venire members

before making selection decisions.

Lewis consciously decided not to exhaust peremptory challenges because he was able to

see which venire member would be called next to replace a challenged one.  His extensive jury

selection experience provided a sound basis for exercising intuition.  At the Rule 35(c) hearing,

Lewis testified, "I believe that how [potential jurors] appear, how they look, how they, how they

look at us, how they look at our client, I believe that their actions many times do speak louder

than words and I believe that in voir dire that you must factor in their actions, oftentimes as

much or even more than their words." [sic]  Based on all available information, he concluded

other jurors remaining in the pool would have been worse for Dunlap than those not challenged.

Gayle did advocate "burning" or exhausting the peremptory challenges, but he could not identify any rulings or challenges for cause that might have succeeded on appeal. Lewis testified:

> [The abuse of discretion standard and harmless error are] certainly not the kind of thing I want to rely upon. Your client's life is at stake. To say we're going to blindly exercise our peremptory challenges with or without regard to the real composition of the jury and what's really happening in the courtroom in front of our eyes? . . . . Step Number 1, the goal is to get a juror who has a reasonable possibility of saving [Dunlap's] life. This jury, this courtroom, this day, not an appeal, today.

Exhausting peremptories is not only bad policy, it flouts the very purpose of jury selection and encourages a perversion of that process. The purpose of jury selection is to empanel a fair and impartial jury, not to create a petri dish for errors.

The Colorado Supreme Court reasonably determined that Lewis' decision not to exhaust peremptory challenges was based upon a reasonable strategic decision. The law does not permit a habeas court to engage in a critical review of trial counsel's performance on the basis of hindsight. Based on the facts of the case, viewed as of the time of counsel's conduct, there is sufficient support for finding Lewis' strategy reasonable.

## II. Other Constitutional Claims

### A. The Prosecutor Misled the Jurors as to their Individual Responsibility for Determining Punishment in Violation of Dunlap's Eighth Amendment Rights
### (Dunlap's Claim 5)

Dunlap argues the Colorado Supreme Court unreasonably applied the U.S. Supreme Court's decision in *Caldwell v. Mississippi* in determining that his trial was fundamentally fair and was not prejudiced by the prosecutor's closing argument. The prosecutor argued in his closing:

When you go into the jury room and you look at the instructions and you look at the evidence and you remember the victims and you remember what occurred, we ask that you look to each other, you look to each other for the strength and the courage to do the right thing in this case. We ask that you work together and deliberate together, 'cause this is not a decision any one of you has to make all by yourself, this is a decision . . .

*Dunlap I* at 762. Dunlap's counsel interrupted with an objection. *Id.* The judge overruled, but directed the jury to reread their instructions and to rely on the judge's statement of the law and no one else's. The prosecutor clarified as he continued:

This is a decision that you have to make individually, because it's important to each one of you, just as it's important to society. But it's also a decision that you make collectively, and that's why I say look to each other for support and guidance.

*Id.*

According to Dunlap, this exchange communicated to the jury that each member was not individually responsible for his or her decision. The Colorado Supreme Court found this single, isolated statement in the closing improper. *Dunlap I*, at 763. It went on to hold, however, that the jury was clearly instructed about each member's individual responsibility in deciding the case, and that Dunlap's trial was fundamentally fair. *Id.* Dunlap alleges the Colorado Supreme Court's resolution of this issue was contrary to, or involved an unreasonable application of, clearly established federal law. Again, I disagree.

## Clearly Established Federal Law

The parties agree *Caldwell v. Mississippi* is the clearly established federal law. 472 U.S. 320 (1985). Under *Caldwell*, it is impermissible to base a death penalty on the decision of a jury led to believe that responsibility for its verdict lies beyond the individual jurors' decisions. *Id.* at 328. A single inappropriate comment does not, however, lead to an unconstitutional verdict, even if it is "universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The

threshold, rather, is whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal citations omitted). My review is, therefore, limited to the narrow consideration of constitutional violations under the Due Process Clause. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974).

This standard is more deferential than the traditionally broad exercise of supervisory power. *Id.* Under habeas corpus review, the reasons are clear: (a) the appellate court does not view the evidence and facts as the trial judge can, (b) jurors may consider the fact that the reviewing court can only lessen a sentence (and not increase it) in deciding to impose a more severe sentence as a starting point, (c) jurors may decide to send a message with an unfair sentence knowing that it will be reduced later and (d) the fact of appellate review could be used as an argument to persuade fence-sitting jurors. *Caldwell*, 477 U.S. at 328-29.

In *Caldwell*, the prosecutor told the jury that its decision was not final because the verdict would be automatically appealed to the state supreme court. 477 U.S. at 325. When the defense objected, the judge overruled and sided with the prosecution, agreeing the jury was entitled to know about the right of automatic appeal in capital cases. *Id.* The U.S. Supreme Court overturned the sentence because it found this exchange permitted the jurors to view themselves as only a preliminary step in the process. *Id.* at 336. In key part, the Court ruled, "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will minimize the importance of its role." *Id.* at 333.

### Discussion

Dunlap's case poses similar questions but facts distinguishable from those presented in *Caldwell*. Here, the prosecutor did not state that another entity would review the decision, but instead commented that the jurors should look to each other. *Dunlap I* at 762. Although the trial

judge overruled the objection, he did not speak up in support of the prosecution as did the judge in *Caldwell*. *Id.* at 762, n.48. The judge also re-instructed the jury to eliminate any lingering confusion. *Id.* Finally, the prosecutor clarified that he merely meant to encourage the jurors to lean on one another for strength. *Id.* His statement after defense counsel's objection explains that jurors should, "look to each other for support and guidance." *Id.*

Whether the prosecutor's comments were appropriate is not for me to decide. Even were I to reach this question and decide in Dunlap's favor, he would still have to show the impropriety of the prosecutor's comments unconstitutionally misled the jury and that the Colorado Supreme Court was unreasonable in deciding otherwise. The Colorado Supreme Court determined the trial judge's immediate instruction to the jury to rely solely on his statement of law combined with the prosecutor's clarification resolved any confusion that the original statement may have caused. *Id.* This is a reasonable conclusion and application of the facts of the case.

### B. The Jury Improperly Weighed Rebuttal Evidence in Violation of Dunlap's Eighth Amendment Rights (Dunlap's Claim 6)

Because he did not argue the existence of the "not a continuing threat" mitigator at the sentencing phase of his trial, Dunlap argues the trial court erred in admitting evidence in rebuttal of that mitigating factor and that the admission of this evidence renders his death sentence unconstitutional. Emphasizing the trial court's explicit instructions, the Colorado Supreme Court found that although the admission of this evidence was improper during the eligibility determination, the error was harmless.

Colorado's four-step procedure in death penalty cases permits the jury to consider evidence of other crimes and bad acts. The U.S. Supreme Court requires bifurcation, a "narrowing" decision based first on finding aggravating circumstances or facts (the "eligibility

phase"), and then consideration of any relevant mitigating evidence concerning the defendant and the crime(s). The question is whether admitting rebuttal evidence at the eligibility phase of Dunlap's death penalty trial unconstitutionally permitted the prosecution to expand the list of statutory aggravators qualifying him for the death sentence.

Colorado's statutory scheme provides as follows. At step one, the jury must determine whether at least one statutory aggravator exists. At step two, if such an aggravator exists, the jury must consider whether mitigator(s) exist. At step three, if such mitigator(s) exist, the jury must determine whether they outweigh aggravator(s). If they do not, at step four the jury must decide whether to impose death or life imprisonment. By this "narrowing" process, step four gives the defendant a second opportunity to persuade the fact-finder against death and the jury may consider matters of character, background and history beyond the aggravators and mitigators previously considered in the narrowing process.

Relying on *People v. Saathoff*, 790 P.2d 804 (Colo. 1990), Dunlap's trial judge ruled that at step three the prosecution could introduce evidence relevant to a mitigating factor set out in the statute even though Dunlap had not raised that mitigator. In fact Dunlap had announced before the penalty phase began that he would not offer evidence of nine of the twelve statutory factors. Lewis further stated that no jury instructions would be requested on the factors he did not raise. He advised the court that his mitigation evidence would concern Dunlap's age, his cooperation with police officers and his family history. He specifically identified the remaining nine factors he would not address, including the last mentioned in the statute that Dunlap was not a continuing threat to society.

Nevertheless, at step three the trial court admitted the prosecutor's evidence rebutting the "not a continuing threat" mitigator, including Dunlap's three prior adjudicated aggravated

robberies, three non-adjudicated aggravated robberies, victim responses to some of those robberies, Dunlap's bragging and excitement following some of them, his alleged attempt to shoot a rival, threats to prosecution witnesses, his non-adjudicated sale of crack cocaine and his acquisition following the charged homicides of the tattoo of the smoking gun with the caption "By Any Means Necessary."

## Clearly Established Federal Law

The death penalty is constitutional, but it may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. *Gregg v. Georgia*, 428 U.S. 153, 188-89 (1976) (citing *Furman v. Georgia*, 408 U.S. 238 (1972)). Accordingly, a state utilizing the death penalty must ensure that the discretion of a sentencing body to impose that penalty is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Zant v. Stephens*, 462 U.S. 862, 874 (1983). A defendant is entitled to present any relevant mitigating evidence that might influence a jury not to sentence him to death. *Id.* at 972-73.

These constitutional mandates are, admittedly, in tension. A jury must be limited in its discretion, but at the same time its unfettered access to mitigating evidence is necessary to ensure an individualized determination. Death penalty sentencing schemes accommodate these requirements through a bifurcated process. *Tuilaepa v. California*, 512 U.S. 967 (1994). A jury's discretion is limited in determining whether a defendant is eligible for the death penalty (the eligibility phase), but it is unbridled in its consideration of mitigating evidence at the phase at which it determines whether the defendant should in fact receive that sentence. *See Buchanan v. Angelone*, 522 U.S. 269, 275-76 (1998). Thus, the need for objectivity and consistency achieved during the eligibility phase is complemented by "an <u>individualized</u> determination on

41

the basis of the character of the individual and the circumstances of the crime" at the sentencing phase. *Zant*, 462 U.S. at 879 (emphasis in original).

States have adopted a variety of sentencing schemes consistent with these constitutional minimums. Generally, these schemes are classified by the nature and scope of evidence a sentencing jury is permitted to consider at the eligibility phase. In "weighing" states, after determining the existence of at least one statutory aggravator, the jury must weigh the aggravating factor or factors against the mitigating evidence in determining whether the defendant is eligible for the death penalty. The jury may determine a defendant eligible for the death penalty only if the statutory aggravating factor(s) outweigh the defendant's mitigating evidence. In contrast, in "non-weighing" states, the eligibility determination is complete once the jury finds that a statutory aggravator exists and it need not weigh any mitigating evidence at that phase.

As the U.S. Supreme Court noted in *Stringer v. Black*, "the difference between a weighing State and a nonweighing State is not one of 'semantics' . . . ." 503 U.S. 222, 231 (1992). In a non-weighing state, if a jury has found that at least one valid statutory aggravator exists, its consideration of an invalid sentencing factor does not infect the process by which it has determined the defendant eligible for death. *Id.* at 232. If a reviewing court determines the jury's consideration of the invalid factor made no difference in the ultimate outcome, there is no constitutional violation.[18] *Id.* In a weighing state, however, a jury's consideration of an invalid

_____

[18] As the Court noted in *Zant*, consideration of an invalid eligibility factor amounts to constitutional error in a non-weighing state in only two circumstances: (1) if the eligibility factor is invalid because "it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected," or it "attache[s] the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process . . . or to conduct that actually should militate in favor of a lesser penalty;" 546 U.S. at 885; or (2) if the jury's

statutory aggravator skews the weighing process.  *Id.*  Once the weighing process has been

skewed, "only constitutional harmless-error analysis or reweighing at the trial or appellate level

suffices to guarantee the defendant received an individualized sentence."  *Id.*

As Dunlap notes, the U.S. Supreme Court has "largely eliminated the distinction between

weighing and non-weighing states for purposes of determining whether admission of invalid

aggravating evidence rendered a death sentence unconstitutional."  Am. Pet. (Doc. 54) at 174.

In *Brown v. Sanders*, the Court dismissed the weighing/non-weighing dichotomy as "needlessly

complex and incapable of providing for the full range of possible variations."  546 U.S. 212, 219

(2006).  In so ruling, the Court announced a new rule, applicable to both weighing and non-

weighing schemes:

> An invalidated sentencing factor (whether an eligibility factor or not) will render
> the sentence unconstitutional by reason of its adding an improper element to the
> aggravation scale in the weighing process <u>unless</u> one of the other sentencing
> factors enables the sentencer to give aggravating weight to the same facts and
> circumstances.

*Brown*, 546 U.S. at 220 (emphasis in original).  Dunlap's reliance upon *Brown* is, however,

misplaced.

As noted *ante*, a case decided after a petitioner's conviction and sentence became final

may not be the predicate for federal habeas relief unless the decision was dictated by precedent

existing when the judgment in question became final.  *Stringer*, 503 U.S. at 227 (citing *Teague v.*

*Lane*, 489 U.S. 288 (1989)).  As the language of the U.S. Supreme Court makes clear, *Brown*

marks a break with precedent.  The Court noted that this rule would apply "henceforth,"

implying that it had not applied previously, and felt compelled to dismiss the importance which

---

consideration of the invalid eligibility factor allowed it to hear evidence that would have been
otherwise inadmissible.  *Id.* at 886.

it had previously afforded the distinction between weighing and non-weighing states before announcing this rule.  Because this rule was announced seven years after Dunlap's conviction became final, he may not rely on it in his claim for habeas relief.  With these considerations in mind, I turn to Dunlap's argument.

**Discussion**

Dunlap argues the trial judge improperly allowed the prosecution to rebut mitigating factors upon which he did not rely, effectively enabling the prosecution to create additional aggravating factors not identified in Colorado's death penalty statute.  He contends that the jury's consideration of these factors unconstitutionally swayed its weighing of aggravating and mitigating factors under C.R.S. § 16-11-103(2)(b)(II).

As the Colorado Supreme Court elaborated in *People v. Tenneson*:

> First, the jury must determine if at least one of the statutory aggravating factors exists. If the jury does not unanimously agree that the prosecution has proven the existence of at least one statutory aggravator beyond a reasonable doubt, the defendant must be sentenced to life imprisonment. Second, if the jury has found that at least one statutory aggravating factor has been proven, the jury must then consider whether any mitigating factors exist.  There shall be no burden of proof as to proving or disproving mitigating factors, and the jury need not unanimously agree upon the existence of mitigating factors. Third, the jury must determine whether sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist.  Fourth, and finally, if the jury finds that any mitigating factors do not outweigh the proven statutory aggravating factors, it must decide whether the defendant should be sentenced to death or to life imprisonment.

788 P.2d 786, 789 (1990) (internal citations and quotations omitted).  According to the Colorado Supreme Court, the first three steps of this process resemble a weighing scheme while the fourth step resembles a non-weighing scheme.  *Dunlap I*, 975 P.2d at 739.  "In other words, the eligibility phase continues through step three, when the jury weighs mitigating evidence against statutory aggravators.  Step four, when the jury makes its final decision about life imprisonment

or death, is the selection phase when all relevant evidence is permissible." *Id.*

The Colorado Supreme Court found improper the trial judge's admission of evidence introduced by the prosecution for the purpose of rebutting mitigati*n*g factors not raised by Dunlap.  In light of the limiting instructions given by the trial judge, however, the Colorado Supreme Court found this to be harmless error and dismissed Dunlap's claim for relief.

Dunlap now contends that the Colorado Supreme Court ruled contrary to clearly established federal law in applying the harmless error test once it found the trial judge had improperly admitted the prosecution's rebuttal evidence during the eligibility phase of his death penalty sentencing.  Because *Brown* does not apply, constitutional harmless-error analysis or reweighing at the trial or appellate level may cure the presumed constitutional deficiency. *Stringer*, 503 U.S. at 232.  Contrary to Dunlap's argument, the Colorado Supreme Court properly applied clearly established federal law when it subjected this impropriety to harmless error analysis.

Perhaps anticipating this finding, Dunlap argues that the Colorado Supreme Court was unreasonable in finding that the jury's consideration of improper aggravating factors constituted harmless error.  Specifically, Dunlap focuses on the ineffectiveness of the jury instructions. After listing the fourteen factors the jury was permitted to consider in mitigation during the eligibility phase (including the "not a continuing threat" mitigator), the trial judge instructed the jury that it could "not in any fashion consider any of these types of factors as aggravation or reasons in favor of the death sentence."  The judge further instructed the jury that it could not consider any of the testimony offered in rebuttal of the "not a continuing threat" mitigator as an aggravating factor and ordered the jury to "disregard the evidence and not consider the evidence for any purpose whatsoever" if it determined the rebuttal evidence had no bearing on the issue of

mitigation.

The Colorado Supreme Court concluded that the trial judge "clearly instructed the jury that it could not consider any evidence regarding mitigating facts as aggravation or in support of the death penalty." *Dunlap I*, 975 P.2d at 743. It also concluded that the trial judge "instructed the jury that in step three it could only weigh 'the specified aggravating factor or factors against any or all mitigating factor or factors.'" *Id.* In the view of the Colorado Supreme Court, these instructions "averted the danger envisioned by the Supreme Court in *Stringer* that aggravating circumstance evidence would find its way into the balance in favor of death," *id.*, and the improper admission of this evidence constituted harmless error beyond a reasonable doubt.

Dunlap argues the trial judge's instructions failed to limit adequately the jury's consideration of the improperly admitted rebuttal evidence. Read as a whole, however, the instructions sufficiently limited the scope of evidence the jury was permitted to hear at the eligibility phase. They listed the aggravating factors alleged by the prosecution and the statutorily permitted mitigating factors and expressly directed the jury to weigh "the specified aggravating factor or factors found to exist against any mitigating factor or factors." Although, as Dunlap notes, the trial judge did not specifically limit the jury's consideration of evidence relating to his juvenile robberies, lack of remorse, previous assaultive behavior, adjudicated robberies and escalating pattern of violence, the instructions did expressly limit the jury to weighing the specified aggravating factors against any mitigating factors. Contrary to Dunlap's arguments, these instructions limited the jury's consideration of this evidence to rebuttal of a mitigating factor, and directed the jury not to consider the evidence as an aggravating factor. The Colorado Supreme Court reasonably determined that these instructions rendered the improper admission of this evidence at the weighing phase harmless.

*C. The Jury Improperly Weighed Evidence of a Prior Felony Conviction in Violation of Dunlap's Eighth Amendment Rights (Dunlap's Claim 7)*

The only evidence offered to support the "prior conviction" statutory aggravator was Dunlap's conviction for aggravated kidnapping in the course of the Burger King robbery. The Colorado Court of Appeals reversed and remanded that conviction in order for the trial court to determine and order restitution. As a result, Dunlap asserts no legal judgment for the Burger King conviction existed at the time of his penalty phase, and it cannot serve as the basis for a statutory aggravator.

**Clearly Established Federal Law**

Although the death penalty does not run afoul of the Eighth Amendment's prohibition against cruel and unusual punishment, the U.S. Supreme Court has made it abundantly clear that a death sentence "cannot be predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process.'" *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (citing and quoting *Zant*, 462 U.S. at 884-85, 887 n.24). Thus, where a sentence is predicated upon an impermissible or irrelevant sentencing factor, it may be overturned.

In *Johnson*, the Court found unconstitutional a death sentence based in part on a reversed conviction. At trial, the sentencing jury found three aggravating circumstances, including the fact that the defendant had been previously convicted of "a felony involving the use or threat of violence to the person of another." *Id.* at 581. The jury then determined the statutory aggravators outweighed the mitigating factors and sentenced the defendant to death.[19] The conviction upon which the previous felony aggravator was based was reversed. The Mississippi

---

[19] For purposes of Dunlap's claim, Colorado's death penalty sentencing scheme is similar to the weighing scheme employed by Mississippi.

Supreme Court nonetheless upheld the conviction. On *certiorari*, the U.S. Supreme Court found the subsequent reversal of the conviction required Johnson's death sentence to be reversed. Of significance, the Court noted that the prosecutor relied heavily upon the conviction in his argument to the jury in favor of the death penalty.

Reliance upon an invalid sentencing factor does not, however, mandate reversal. As discussed above, in a weighing state, a constitutional deficiency may be cured by constitutional harmless-error analysis or reweighing at the trial or appellate level. *Stringer*, 503 U.S. at 232.

## Discussion

The Colorado Court of Appeals found Dunlap's sentence in the Burger King case "illegal to the extent it does not reflect consideration and fixing of restitution . . . ." *People v. Dunlap*, 222 P.3d 364, 366 (Colo. Ct. App. 2009), reh'ng denied *People v. Dunlap*, 2009 Colo. App. LEXIS 1191 (Colo. Ct. App., July 2, 2009), cert. denied *Dunlap v. People*, 2010 Colo. LEXIS 18 (Colo., Jan. 11, 2010). The Colorado Court of Appeals expressly rejected Dunlap's argument that the illegality of his Burger King sentence affected the finality of his conviction and the denial of collateral review in the Burger King case. *Id.* at 366, 368-69.

Nonetheless, Dunlap argues that the Colorado Court of Appeals' decision invalidated his Burger King conviction, and "no legal judgment for that conviction existed at the time of his penalty phase." Am. Pet. (Doc. 54) at 181 (citing Colo. R. Crim. P. 32(b)(3)). Under Colorado's sentencing regimen, a previous conviction for a class 1 or 2 felony involving violence may be considered as an aggravating factor in imposing the death penalty. Colo. Rev. Stat. § 16-11-103(5)(b) (1995) (relocated to 18-1.3-1201(5)(b) (2009)). Unlike the situation in *Johnson v. Mississippi*, the Colorado Court of Appeals did not reverse Dunlap's conviction for the Burger King felonies. It merely remanded to the trial court for the consideration and fixing of

restitution. In light of the Court of Appeals' statement that its decision "does not affect the finality of his judgment of conviction," Dunlap's argument has no merit.[20]

### D. The Trial Judge Improperly Excused for Cause a Prospective Juror in Violation of Dunlap's Sixth and Fourteenth Amendment Rights (Dunlap's Claim 8)

Dunlap asserts the trial judge improperly excused a prospective juror, Juror M, for cause, in violation of his Sixth and Fourteenth Amendment rights. Although the Colorado Supreme Court determined there was sufficient justification for the trial court's decision to dismiss the juror, Dunlap argues it unreasonably applied clearly established federal law. The Colorado Supreme Court reasonably applied clearly established federal law in affirming the trial judge's decision.

### Clearly Established Federal Law

The Sixth Amendment guarantees a right to trial by jury in federal criminal cases, and the Fourteenth Amendment extends that right to defendants in state criminal proceedings. *See Duncan v. Louisiana*, 391 U.S. 145, 148-158 (1968). Inherent in that guarantee is a right to trial by a jury selected from a representative cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). The fair cross-section principle does not, however, extend to the specific composition of petit-juries. *See Lockhart v. McCree*, 476 U.S. 162, 173-74 (1986). Nor does it require a petit-jury to include individuals with preconceived notions on the propriety of the death penalty. As the U.S. Supreme Court held in *Lockhart*, any "group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a

---

[20] As noted *supra* at n. 2, Dunlap also challenged the validity of his Burger King conviction in a separate action before me. *Dunlap v. Zavaras*, 1:06-cv–611-JLK. As he correctly notes, if I were to grant habeas relief in that proceeding, it is likely that there would be no basis for the statutory aggravator. This argument is moot, however, because I have denied Dunlap's Petition for Writ of Habeas Corpus relating to his Burger King conviction.

particular case may be excluded from jury service without contravening any of the basic objectives of the fair cross-section requirement." *Id.* at 176-77.

Also inherent in that guarantee, however, is the right to a trial by a fair and impartial jury. *See, e.g.*, *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). A juror's impartiality may be challenged on many grounds. Most relevant to Dunlap's claims, a juror may be challenged as impartial based on his or her views about capital punishment. As the U.S. Supreme Court has made clear, however, "a juror may not be challenged for cause based on his views about capital punishment <u>unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath</u>." *Witherspoon v. Witt*, 469 U.S. 412, 420 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)) (emphasis in original). If a juror is improperly excluded, the proper remedy is vacating the death sentence. *Gray v. Mississippi*, 481 U.S. 648, 659-60 (1987).

These limitations notwithstanding, habeas review of a trial judge's decision to exclude a juror for cause is constrained by AEDPA. In determining a potential juror's bias, the trial judge's decision necessarily involves credibility findings akin to "factual issues." *Witt*, 469 U.S. at 429. Pursuant to AEDPA, such factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### Discussion

The Colorado Supreme Court acknowledged that the propriety of this excusal was a close question, but found that Juror M's statements provided sufficient basis for the trial judge's decision to excuse him for cause. Juror M's statements at voir dire were most significant. As the Colorado Supreme Court noted, "Juror M expressed that while he thought the death penalty could be appropriate in 'extreme' cases, a person would have to be 'completely evil, 100

percent' before he could vote for the death penalty in the final stage of deliberations." *Dunlap III*, 173 P.3d at 1086. Although Juror M never stated he would automatically vote against the death penalty, there was sufficient evidence that he would vote for life imprisonment if <u>any</u> mitigation existed. The Colorado Supreme Court concluded that this evidence "shows that he was substantially impaired in his ability to fairly and impartially weigh the aggravating and mitigating evidence."[21] *Id.* at 1087.

Dunlap argues that the Colorado Supreme Court erroneously applied clearly established federal law in upholding the trial judge's improper excusal for cause of Juror M. According to Dunlap, because the juror could "assign whatever weight he deemed appropriate to factors he found to be mitigating," his views were entirely consistent with Colorado's capital sentencing scheme. Dunlap opines "that [M] could consider – and indeed that he could impose – the death penalty in an appropriate case." To the extent Juror M's answers reflected uncertainty in his ability to impose the death penalty, Dunlap argues it indicates M's "insistence upon knowing the facts before selecting the penalty." This characterization is extravagant.

Having fully reviewed Juror M's voir dire, I am hard pressed to find any justification for Dunlap's argument. Juror M repeatedly stressed the difficulty he would face in imposing the death penalty, and emphasized that he would be unwilling to impose the death penalty if a defendant provided any evidence in mitigation. As previously discussed, Colorado's death penalty statute requires a "weighing" of the aggravating and mitigating factors at the eligibility phase. Although Dunlap asserts that a juror is entitled to "determine the weight to be given relevant mitigating evidence," it is apparent from the record that Juror M was unwilling to weigh

---

[21] In reaching this result, the Colorado Supreme Court noted that, consistent with the U.S. Supreme Court's ruling in *Witt*, it deferred to the trial judge's assessment of credibility.

aggravating and mitigating evidence in accordance with Colorado's capital sentencing scheme. Even if, however, I found some support for Dunlap's argument, he has failed to show the trial judge's finding of fact unreasonable by clear and convincing evidence.

### E. The Cumulative Impact of the Errors in this Case Renders Dunlap's Death Sentences Unconstitutional (Dunlap's Claim 10)

Finally, Dunlap argues that, even if I find his other claims harmless or nonprejudicial, their combined impact so infected the outcome of his trial that they undermine the confidence in his death sentences. As the 10th Circuit has noted, "[i]n the federal habeas context the only otherwise harmless errors that can be aggregated are federal constitutional errors, and such errors will suffice to permit relief under cumulative error doctrine 'only when the constitutional errors committed in the state court so fatally infected the trial that they violated the trial's fundamental fairness.'" *Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009) (quoting *Young v. Sirmons*, 551 F.3d 942, 972 (10th Cir. 2008)).

Upon review of Dunlap's claims for relief, no court has found constitutional errors. Thus, there are no errors to aggregate.

### Summary and Conclusion

The Colorado Supreme Court's upholding of Dunlap's death sentence was neither contrary to nor an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented at trial. Each of the decisions of the Colorado Supreme Court was unanimous and *en banc*. Moreover, thorough examinations of Dunlap's counsel's representation under the two-prong test announced in *Strickland v. Washington* clearly establish that the representation did not fall below an objective standard of reasonableness or even suggest a

reasonable probability that but for counsel's alleged unprofessional errors the result would have been different.

Dunlap's trial counsel made strategic choices after thorough, indeed meticulous, investigation of the law and facts relevant to plausible options. Strategic choices, such as to forego mental health mitigation, made with less than complete investigation, were reasonable professional judgments precisely because they were made on the basis of irrefutable facts and an appropriate assessment of the relevant law and available trial tactics. Further investigation would have yielded nothing to detract from the strategic decisions counsel made. The strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance is more than justified by counsel's conduct in this case. Lewis' representation of Dunlap at the penalty phase in particular is an exemplar of competent, dedicated and zealous advocacy.

In *Smith v. Spisak*, the U.S. Supreme Court found deficient performance, but no prejudice. 130 S. Ct. 676 (2010). In a rambling closing argument, defense counsel portrayed the defendant as "sick," "twisted," and "demented", and emphasized the gruesome nature of the three killings and his client's threats to continue committing crimes. Counsel understated the facts upon which defense experts had based mental illness conclusions, made no mention of other mitigating circumstances, and made no explicit request that the jury return a verdict against death. The closing was assumed *arguendo* inadequate and still the Court held the deficiencies did not raise a reasonable probability that the result would have been different.

As Justice Stevens wrote in his concurring opinion:

[T]he strategic decision to draw the sting out of the prosecution's argument and gain credibility with the jury by conceding the weakness of one's own case is generally reasonable . . . but can be executed so poorly as to render even the most

53

reasonable of trial tactics constitutionally deficient under *Strickland* . . . . [B]ut Spisak's own conduct alienated and ostracized the jury, and his crimes were monstrous . . . . [E]ven the most skillful closing arguments – even one befitting Clarence Darrow – would not have created a reasonable probability of a different outcome in this case.

*Id.* at 691-93. The same can be said not only of the closing arguments in this case, but the entire defense as well – and the performance of Dunlap's trial counsel came much, much closer to the Darrow ideal than the Spisak debacle.

In *Wood v. Allen*, the U.S. Supreme Court distinguished between negligent omission and strategic decision. 130 S. Ct. 841 (2010). The defense counsel in that case, two with significant experience and the third only recently admitted to the bar who handled the penalty phase, failed to investigate and present evidence at the penalty phase of the defendant's mental retardation. The district court held that the state court's finding of strategic decision was an unreasonable determination of the facts. The 11th Circuit reversed and the U.S. Supreme Court affirmed, ruling that the evidence supported the factual determination that the failure to pursue or present evidence was not mere oversight or neglect, but the result of a deliberate decision to focus on other defenses. "[E]vidence about Wood's mental deficiencies may have led to rebuttal testimony about the capabilities he demonstrated through his extensive criminal history, an extraordinarily limited amount of which was actually admitted at the penalty phase of the trial." *Id.* at 850 n.3. The state court factual decision, it was held, was not unreasonable merely because the federal district court would have reached a different conclusion in the habeas proceeding.

Justice Stevens dissented and wrote that whether counsel's decision not to investigate mitigating evidence that might be admissible at the penalty phase was the product of strategy was a question of fact, and the only reasonable factual conclusion to be drawn from the record

is that the decision was a result of inattention and neglect by attorneys preoccupied with other concerns. "[S]uch a decision," he wrote, "is the antithesis of a strategic choice . . . . A decision cannot fairly be characterized as 'strategic' unless it is a conscious choice between two legitimate and rational alternatives. It must be borne of deliberation and not happenstance, inattention, or neglect." *Id.* at 852-53 (Stevens, J., dissenting).

In *Wong v. Belmontes*, the U.S. Supreme Court held that the rebuttal evidence the prosecution could have presented had defense counsel undertaken the course envisioned by the ineffectiveness claim must be factored into the analysis. 130 S. Ct. 383 (2009). Dunlap's trial counsel conducted an exhaustive multi-state search for mitigation evidence and presented nine witnesses in support of a credible argument focusing on Dunlap's troubled childhood at the penalty phase. They did so while avoiding any reference to mental health evidence because the prosecution was poised to present a veritable tsunami of damaging evidence from Dunlap's conduct in jail awaiting trial and his nearly five-month stay at the Colorado State Hospital. The decision to forego further investigation of mental health evidence was not made in a vacuum. Defense counsel had the assessment of their own psychiatrist, extensive background about Dunlap's mother, his personal history and, most importantly, the report from the Colorado State Hospital which concluded, among other things, that Dunlap was malingering. Further investigation into mental health evidence would have been a fool's errand. The best strategy – and the one counsel chose – was to avoid opening the door to the evidence of Dunlap's malingering, cruelty to other patients, threats to hospital staff, inculpatory admissions, lack of remorse and sociopathy.

*Strickland*'s second prong is that actual prejudice must be shown. The gist of the test is to determine whether there is a reasonable probability that but for counsel's unprofessional

errors, the result would have been different.  Not a single jurist from the state trial court through the Colorado Supreme Court, to and including the instant U.S. District Court, has so found.  Nor, for that matter, was any ruling by the trial court found to be anything more than harmless error.  As mentioned at the beginning of this memorandum opinion, the Colorado Supreme Court's decisions were unanimous.  Thus there is no inference from dissents or concurring opinions that reasonable jurists considering the issues presented might differ.

In the final analysis, Dunlap was competently represented, fairly tried, and duly sentenced to death for having committed four vicious murders of three teenagers and a mother of two children for no intelligible reason at all.  The processes of the law have been exhausted, the defendant's guilt is uncontestable and the penalty, awesome and stark as it is, meets every requirement of the law.

Nathan Dunlap's Amended Petition for Writ of Habeas Corpus (Doc. 54) is denied.


Dated:  August 24, 2010

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE
